*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *CATHERINE LaFLAMME,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:13-cv-460-JDL* |
| | ) | |
| *RUMFORD HOSPITAL,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON DEFENDANT'S*
*MOTION FOR SUMMARY JUDGMENT*

Rumford Hospital (the "Hospital") moves for summary judgment as to each of its former employee Catherine LaFlamme's three remaining claims against it, for failure to accommodate her disability, retaliation on account of her request for reasonable accommodation, and unlawful discrimination on account of her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, and the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 701 *et seq.  See* Defendant's Motion for Summary Judgment ("Motion") (ECF No. 41) at 1-2; Complaint (ECF No. 1) ¶¶ 82-93; Stipulation of Partial Dismissal (ECF No. 38).[1]  For the reasons that follow, I recommend that the court deny the Motion.

---

[1] The plaintiff is now known as Catherine LaFlamme Prescott.  *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 44) at 1.  However, she has not filed a motion to change her name in the caption of this lawsuit.

## I.   Applicable Legal Standards

### A.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

2

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a

party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of the plaintiff as the nonmovant, reveal the following.[2]

### A.  Plaintiff Begins Work for Hospital

The plaintiff worked at the Hospital as a *per diem* nurse in the medical surgical ("Med Surg") unit from March 28, 2011, to June 12, 2011.  Defendant's Statement of Material Facts ("Defendant's SMF") (ECF No. 41-1), attached to Motion, ¶ 1; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF") (ECF No. 45) ¶ 1.  She was hired by Diane York.   Plaintiff's Additional Statement of Material Facts ("Plaintiff's Additional SMF"), commencing on page 19 of Plaintiff's Opposing SMF, ¶ 2; Defendant's Reply Statement of Material Facts ("Defendant's Reply SMF") (ECF No. 47) ¶ 2.  The plaintiff worked a "fair number" of shifts as a *per diem* nurse in Med Surg between the time that she was hired and her transfer to a full-time position.  *Id*. ¶ 3.  She received virtually a full-time schedule of hours as a *per diem* nurse.  *Id*. ¶ 4.

The plaintiff applied for and was hired to fill a position working full time (40 hours) as a nurse in the Med Surg unit effective June 12, 2011.  Defendant's SMF ¶ 2; Plaintiff's Opposing SMF ¶ 2.  On a Change of Status form completed on or about June 12, 2011, York wrote that the

---

[2] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

4

plaintiff "needed a 90 day evaluation from date of per diem hire." Plaintiff's Additional SMF ¶ 6; Defendant's Reply SMF ¶ 6. York anticipated that the 90-day evaluation would occur at the end of June and would cover both the period of time during which the plaintiff had worked as a *per diem* and the period of time that she was in full-time status. *Id.* ¶ 7.

The plaintiff requested a reduction to 32 hours a week because she was having problems working full time, and the request was granted, effective August 14, 2011. Defendant's SMF ¶ 3; Plaintiff's Opposing SMF ¶ 3. In October 2011, she requested a reduction to 24 hours a week, which was pending when her disability commenced on November 4 but was approved in December 2011. *Id.* ¶ 4. The plaintiff got along great with her co-workers, had no problems with any co-workers during the course of her employment, and was friends with some of them outside of work. Plaintiff's Additional SMF ¶¶ 10-11; Deposition of Catherine Prescott ("Prescott Dep.") (ECF No. 41-4), attached to Motion, at 94.[3]

The plaintiff received one performance evaluation during her employment at the Hospital, on September 26, 2011. Plaintiff's Additional SMF ¶ 12; Defendant's Reply SMF ¶ 12. The evaluation was two pages long and indicated that she met expectations in all areas. *Id.* ¶ 14. She signed the evaluation on the second page. *Id.*[4]

---

[3] The Hospital denies that the plaintiff "got along great with her co-workers[,]" Defendant's Reply SMF ¶¶ 10-11; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant. I omit the Hospital's further statement that Carlton spoke to nursing staff who gave very negative feedback about the plaintiff's performance and behavior, Defendant's SMF ¶ 39, which the plaintiff denies, Plaintiff's Opposing SMF ¶ 39, viewing the evidence in the light most favorable to the plaintiff, as nonmovant.

[4] The Hospital qualifies paragraphs 12 and 14, stating, *inter alia*, that the evaluation documented the plaintiff's attendance problems. Defendant's Reply SMF ¶¶ 12, 14; Exh. 7 to Deposition of Diane York ("York Dep.") (ECF No. 41-6), attached to Motion, at Page ID ## 22-23.

**B.  Plaintiff Takes Medical Leave Following Back Injury**

The plaintiff injured her back in July 2011.  *Id*. ¶ 15.[5]  On November 4, 2011, she was admitted to the hospital for severe back pain.  *Id*. ¶ 16.  She received a diagnosis of lumbar disc herniation.  *Id*.  Her back injury was a disability as defined by the MHRA, ADA, and Rehab Act. *Id*. ¶ 17.  As a result of her disability, she was unable to perform her position of Med Surg nurse during the period from November 4, 2011, through January 14, 2013.  *Id*.  She was released by her medical provider to work as a nurse without restrictions as of January 15, 2013.  *Id*.  She never worked for the Hospital after November 4, 2011.  Defendant's SMF ¶ 6; Plaintiff's Opposing SMF ¶ 6.

The plaintiff requested and was granted medical leave effective November 4, 2011, which initially ran for 30 days.  *Id*. ¶ 7.  She requested and was granted an extension of her medical leave to January 2012.  *Id*. ¶ 8.  Her Family and Medical Leave Act ("FMLA") leave rights were exhausted in late January 2012.  *Id*. ¶ 9.  She requested an extension of her medical leave in February 2012, stating that she expected to return to work in March 2012.  *Id*. ¶ 10. That request was approved.  *Id*.

When the plaintiff applied for medical leave effective November 1, 2011, she received a letter from the Hospital stating that she would be required to provide the Hospital with a fitness for duty certification prior to returning to work and that she was subject to termination if she did not provide a medical report.  *Id*. ¶ 27.  When she requested extended medical leave in February 2012, she received a second letter stating that she would be required to provide the Hospital with a fitness for duty certification prior to returning to work and that she was subject to termination if

---

[5] I omit the remainder of paragraph 15, which is neither admitted nor supported by the citation given.

she did not provide a medical report.  *Id*. ¶ 28.[6]  At no time after March 2012 did the plaintiff submit a fitness for duty certification or medical report indicating when she would be able to return to work with or without restrictions.  *Id*. ¶ 30.[7]

York visited the plaintiff while she was in the hospital and learned that she was suffering from severe back pain.  Plaintiff's Additional SMF ¶ 18; Defendant's Reply SMF ¶ 18.  York was aware that the plaintiff was hospitalized due to a disc herniation, was referred to a specialist for the condition, and underwent surgery.  *Id*. ¶ 19.  York also understood that the plaintiff was unable to return to work due to her herniation and surgery and would be out of work for an extended time period due to the condition.  *Id*. ¶ 20.  Human Resources Manager Priscilla Bickford understood that the plaintiff was approved for FMLA.  *Id*. ¶ 21.  She understood that the plaintiff had a back surgery and was out on a leave of absence because of it.  *Id*. ¶ 22.  York held the plaintiff's Med Surg position because the plaintiff was on FMLA leave.  *Id*. ¶ 23.

York does not recall what she did to cover for the plaintiff's absence.  *Id*. ¶ 24.  She possibly used *per diem* nurses and allowed part-time employees to pick up extra hours.  *Id*.  Prior to York's retirement, the plaintiff contacted York and informed her that she would be seeing her doctor and learning more about the possibility of returning to work.  *Id*. ¶ 26.

---

[6] My recitation incorporates the plaintiff's correction of the date from 2011 to 2012.  The plaintiff qualifies paragraphs 27 and 28, asserting that, on or about November 9, 2011, she received an FMLA-Provisional Designation that indicated, in connection with her FMLA leave, that she would be required to submit a fitness for duty certification "that states you are able to return to work" prior to being permitted to return to work.  Plaintiff's Opposing SMF ¶¶ 27-28; Exh. 3 to Prescott Dep. at Page ID ##37-41.  She asserts that the Hospital never asked that she provide, prior to being cleared to return to work, documentation indicating that she could return to work.  Plaintiff's Opposing SMF ¶¶ 27-28; Affidavit of Catherine LaFlamme Prescott ("Prescott Aff."), Exh. A (ECF No. 45-1) thereto, ¶ 5.

[7] The plaintiff qualifies this statement, Plaintiff's Opposing SMF ¶ 30, asserting that, following her FMLA leave, the Hospital never requested that she provide a fitness for duty certification or medical report indicating when she would be able to return to work with or without restrictions, Prescott Aff. ¶ 4.  I omit the Hospital's assertion to the contrary, Defendant's SMF ¶ 29, which the plaintiff denies, Plaintiff's Opposing SMF ¶ 29, viewing the evidence in the light most favorable to the plaintiff, as nonmovant.

### C.  Carlton Takes over as Med Surg Manager

Joette Carlton took over York's position, and there was a transitional period when Carlton worked with York to find out what she did and how she did it.  *Id*. ¶ 27.  Carlton became Med Surg manager effective March 1, 2012, while the plaintiff was on medical leave.  Defendant's SMF ¶ 31; Plaintiff's Opposing SMF ¶ 31.  When Carlton took over as manager, she did not know the plaintiff at all.  Plaintiff's Additional SMF ¶ 28; Defendant's Reply SMF ¶ 28.  York explained to Carlton that the plaintiff was out of work on medical leave.  *Id*. ¶ 29.  Carlton knew that the plaintiff had a back surgery and was out of work in connection with that.  *Id*. ¶ 30.  York told Carlton that the plaintiff had informed her that she was going to a doctor for a status update.  *Id*. ¶ 31.  When Carlton took over York's position, York provided her with some information about the plaintiff, including a copy of her evaluation and her disciplinary plan and told Carlton that the plaintiff was on an action plan for attendance issues.  *Id*. ¶ 32.  Carlton testified that she did not recall getting any other information about the plaintiff prior to the plaintiff's job termination except for the information provided to her by York.  Plaintiff's Additional SMF ¶ 33; Deposition of Joette Carlton ("Carlton Dep.") (ECF No. 41-7), attached to Motion, at 16.[8]

In March 2012, shortly after becoming manager, Carlton was asked to complete a reference for the plaintiff for a position at a related company.  Defendant's SMF ¶ 32; Plaintiff's Opposing SMF ¶ 32.  She read the plaintiff's personnel file from the Hospital, which stated that the plaintiff had been counseled by her previous manager about her attendance on September 26,

---

[8] The Hospital denies this, Defendant's Reply SMF ¶ 33; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

2011, prior to her medical leave.  *Id.* ¶ 33.[9]  Between May and September 26, the plaintiff had accrued 36 hours of unscheduled absences, and the limit is 48 hours per year.  *Id.* ¶ 34.  However, the Hospital only counts the first day of any multiple days of unscheduled absences, so between May and September 26, the plaintiff had actually accrued 60 hours of unscheduled absences in four separate episodes, totaling seven days.  *Id.* ¶ 35.[10]

Carlton completed the reference form on or about March 22, 2012, indicating that the plaintiff had attendance problems, did not go above and beyond the requirements of the position, and there were "complaints of rude behavior toward fellow coworkers."  *Id.* ¶ 40.

Carlton covered for the plaintiff's absence from her 24-hour-per-week position by using *per diem* nurses.  Plaintiff's Additional SMF ¶ 35; Defendant's Reply SMF ¶ 35.  She does not recall if she had trouble covering the plaintiff's shifts in that fashion.  *Id.* ¶ 36.  She does not recall ever speaking to the plaintiff after becoming the manager.  *Id.* ¶ 37.

The Hospital instructed the plaintiff to communicate with the insurance carrier handling disability insurance claims, The Hartford, about her condition.  *Id.* ¶ 38.[11]  The plaintiff also communicated with the Hospital about her condition throughout her leave.  *Id.* ¶ 39.  Specifically, she emailed Bickford and Human Resources Assistant Cheryl Smith on numerous occasions.  *Id.*[12]  Smith was aware that the plaintiff was hospitalized for her back and underwent

---

[9] I omit the Hospital's statement that Carlton also saw the plaintiff's personnel file from a related company, Rumford Community Home, Defendant's SMF ¶ 36, which the plaintiff denies, Plaintiff's Opposing SMF ¶ 36, viewing the evidence in the light most favorable to the plaintiff, as nonmovant.  This renders irrelevant the Hospital's further statements about that employment.  *See* Defendant's SMF ¶¶ 37-38.

[10] The plaintiff qualifies paragraphs 33 through 35, Plaintiff's Opposing SMF ¶¶ 33-35, asserting that some of her absences prior to her leave were related to her disability and that, according to Carlton, her attendance issues before she went out on leave were not a factor in her employment termination, Prescott Aff. ¶ 39; Carlton Dep. at 44-45.

[11] I omit the remainder of paragraph 38, which is neither admitted nor supported by the citation given.

[12] I omit the remainder of paragraph 39, which is neither admitted nor supported by the citations given.

back surgery.  *Id.* ¶ 40.  Smith asked the plaintiff for documentation to substantiate her ongoing need to be out of work, and plaintiff provided Smith with this documentation.  *Id.* ¶ 41.[13]

The plaintiff was in weekly contact with the Hospital while she was out on leave.  *Id.* ¶ 42.  She also called Carlton a number of times to provide her with an update regarding her medical condition and status and interest in returning to work in the future, and left messages for her requesting a call back.  Plaintiff's Additional SMF ¶ 43; Prescott Aff. ¶ 6.  Carlton never returned the plaintiff's calls.  Plaintiff's Additional SMF ¶ 44; Prescott Aff. ¶ 7.[14]

### D.  Plaintiff Is Transferred to *Per Diem* Status While on Leave

In May 2012, Carlton needed to fill the 24-hour position that had been held open for the plaintiff since December 2011.  Defendant's SMF ¶ 12; Plaintiff's Opposing SMF ¶ 12.  She and Bickford contacted the plaintiff, who stated that she did not know when she would be able to come back to work.  *Id.* ¶ 13.  According to Bickford, the plaintiff's second three-month leave of absence was ending during the time that they discussed moving her to a *per diem* position.  Plaintiff's Additional SMF ¶ 46; Defendant's Reply SMF ¶ 46.  The plaintiff agreed to go on *per diem* status, and she was transferred to the *per diem* list effective June 2012, rather than be terminated.  Defendant's SMF ¶ 14; Plaintiff's Opposing SMF ¶ 14.  *Per diem* (on call) nurses have no benefits or regular schedule or hours, and work only when needed to fill in for regular

---

[13] The Hospital qualifies this statement, asserting that this documentation related only to the plaintiff's February 2012 request for an extension of her leave.  Defendant's Reply SMF ¶ 41; Prescott Dep. at 41-42 & Exh. 4 thereto, at Page ID ## 42-46.

[14] The Hospital asserts that it is unclear when these calls supposedly were made.  Defendant's Reply SMF ¶¶ 43-44. It objects that, if the calls are claimed to have been made after the plaintiff's termination, they are irrelevant, and if before, they are based on conjecture as to what might have been said in that Carlton never spoke with the plaintiff. *Id.*  The objections are overruled.  As the plaintiff rejoins, it is clear from the context of the statements that the plaintiff alleges the calls were made before her termination.  Plaintiff's Local Rule 56(e) Responses to Defendant's Requests To Strike ("Plaintiff's Resp. to Req. To Strike") (ECF No. 48) ¶¶ 43-44.  The statements are not based on speculation.  They relate what the plaintiff avers she would have told Carlton had she reached her.  I omit the Hospital's assertion that the plaintiff never submitted a request for extension of medical leave after March 2012, Defendant's SMF ¶ 11, which the plaintiff denies, viewing the evidence in the light most favorable to the plaintiff, as nonmovant.

employees. *Id.* ¶ 15.[15]  From June 2012 through December 2012, the plaintiff was on the Med Surg *per diem* (on call) list but was unable to work.  *Id.* ¶ 16.  Carlton understood that the plaintiff was on a medical leave after May 30, 2012.  Plaintiff's Additional SMF ¶ 55; Defendant's Reply SMF ¶ 55.

On July 5, 2012, the plaintiff sent an email to the Hospital stating that she would be returning to work in two weeks.  Defendant's SMF ¶ 18; Plaintiff's Opposing SMF ¶ 18.[16]  On July 18, 2012, the plaintiff sent another email to the Hospital stating that she expected to be cleared to return to work in about two weeks.  *Id.* ¶ 19.  On August 13, 2012, the plaintiff emailed the Hospital to advise that her doctor recommended that she not return to her former position in the Med Surg unit.  *Id.* ¶ 20.  On August 23, 2012, the plaintiff reported that her doctor recommended that she work eight-hour shifts in a doctor's office, but not 12-hour shifts in a Med Surg position. *Id.* ¶ 21.

On August 26, 2012, the plaintiff sent an email to the Hospital stating that she expected to be released within a month to work in an office position.  *Id.* ¶ 22.  On September 21, 2012, the plaintiff reported that she was going to try to get the doctor to clear her to work four- or six-hour shifts with restrictions.  *Id.* ¶ 23.  On October 15, 2012, the plaintiff stated in an email that ". . . it is looking grim that I can return to med surg but I am rehabable [sic] to return . . . in some capacity." *Id.* ¶ 24.  On October 23, 2012, the plaintiff reported that her doctor told her that she

---

[15] The plaintiff qualifies this statement, asserting that when she worked in a Med Surg *per diem* position in the past, she received a virtually full-time schedule, and as of October 2014, there were times the Hospital was unable to find someone to cover a shift after going through its *per diem* list.  Plaintiff's Opposing SMF ¶ 15; Deposition of Michelle Carignan ("Carignan Dep."), Exh. E (ECF No. 45-5) thereto, at 6; Prescott Dep. at 32

[16] The plaintiff qualifies paragraphs 18, 19, and 23, asserting that her doctor indicated to her that she could return to work in an appropriate position with less strenuous hours than the Med Surg unit.  Plaintiff's Opposing SMF ¶¶ 18-19, 23; Prescott Aff. ¶¶ 11, 23.  I omit the Hospital's statement that, starting in July 2012, the plaintiff made various conflicting statements to the Hospital regarding her return to work, Defendant's SMF ¶ 17, which the plaintiff denies, Plaintiff's Opposing SMF ¶ 17, viewing the evidence in the light most favorable to the plaintiff, as nonmovant.

should be able to return to the Med Surg position after "more rehab and possible surgery."  *Id.* ¶ 25.

On November 6, 2012, the plaintiff emailed Smith and Bickford updating them on her work restrictions and asking for their assistance in reaching the hiring managers for positions for which she had applied at the Hospital.  Plaintiff's Additional SMF ¶ 48; Defendant's Reply SMF ¶ 48.  In that email, the plaintiff also indicated that "my goal is to return to work within cmmc [presumably, Central Maine Medical Center] within the next 30 to 60 days."  *Id.* ¶ 49.

In late November 2012, the plaintiff was notified by her doctors that she would be cleared to return to work full time, without restrictions, in four weeks at her next visit. *Id.* ¶ 50.[17]  In late November 2012, the plaintiff informed Smith that her doctors would clear her to return to work full time, with no restrictions, in four weeks.  Plaintiff's Additional SMF ¶ 51; [Maine Human Rights Commission ("MHRC")] Charge of Discrimination ("MHRC Charge"), Exh. C (ECF No. 45-3) thereto, ¶ 36; Prescott Aff. ¶ 24.  Smith did not respond to this information. *Id.*[18]  Smith did not ask the plaintiff to obtain a letter from her doctor confirming the information about clearance to return to work in a matter of weeks.  Plaintiff's Additional SMF ¶ 52; Defendant's Reply SMF ¶ 52.[19]

---

[17] The Hospital's objection to this statement to the extent that it is offered to prove the truth of the matter asserted, Defendant's Reply SMF ¶ 50, is overruled.  The plaintiff represents that it is offered simply as proof of what she was told.  Plaintiff's Resp. to Req. To Strike ¶ 50.

[18] The Hospital's objection to this statement on the basis that the plaintiff contradicts earlier deposition testimony indicating that she did not communicate with the Hospital at that time, Defendant's Reply SMF ¶ 51 (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)), is overruled.  As the plaintiff notes, Plaintiff's Resp. to Req. To Strike ¶ 51, she cites, *inter alia*, her MHRC Charge, which predates her deposition testimony.  In addition, it is not clear, in the portion of the plaintiff's deposition cited by the Hospital, that the Hospital was inquiring about all communications *versus* solely email communications.  Prescott Dep. at 64-65.  Thus, her statement is not excludable pursuant to the *Colantuoni* rule. *See Colantuoni*, 44 F.3d at 4-5 ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

[19] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 52; however, the substance of its qualification is set forth below.

### E.  Hospital Terminates Plaintiff's *Per Diem* Position

The Hospital has a longstanding policy of terminating *per diem* nurses' status if they have not worked within the last six months (or less in certain departments).  Defendant's SMF ¶ 41; Plaintiff's Opposing SMF ¶ 41.  The rationale for not keeping unavailable nurses on the *per diem* list indefinitely is that, after an extended period of not working, the Hospital cannot rely on the nurses' competency, and it is an administrative burden for managers to maintain the required training records on such nurses.  *Id*. ¶ 42.  Between 2010 and 2012, 20 nurses' *per diem* statuses were terminated pursuant to this guideline, including that of the plaintiff.  *Id*. ¶ 43.  In 2012, seven *per diem* nurses' statuses were terminated pursuant to the Hospital's guideline because they had not worked for six months or, in some cases, less than six months.  *Id*. ¶ 44.  None of the other *per diem* nurses whose statuses were terminated in 2012 were on medical leave or had known disabilities.  *Id*. ¶ 45.  Three *per diem* nurses, including the plaintiff, were terminated from the Med Surg unit in 2012.  *Id*. ¶ 46.  The remaining two *per diem* Med Surg nurses were unavailable for less than six months before their status was terminated in 2012.  *Id*. ¶ 47.

During the fall and early winter of 2012, Carlton asked Bickford several times whether she could terminate the plaintiff's *per diem* status because she continued to be unavailable.  *Id.* ¶ 48.  Carlton requested that the plaintiff be removed from the *per diem* list after she had been unavailable for six months.  *Id*. ¶ 49.  Carlton made the decision to terminate the plaintiff and communicated her request to Bickford, who reviewed the decision.  Plaintiff's Additional SMF ¶ 56; Defendant's Reply SMF ¶ 56.

Bickford's process at that time was to use a six-month time frame and, if a *per diem* employee had not worked in six months, the Hospital could terminate the employee.  Plaintiff's Additional SMF ¶ 57; Deposition of Priscilla Bickford ("Bickford Dep.") (ECF No. 41-8),

attached to Motion, at 39.[20]  Carlton told Bickford that she wanted to terminate the plaintiff's *per diem* status to "keep their books clean."  Plaintiff's Additional SMF ¶ 58; Defendant's Reply SMF ¶ 58.[21]  Smith was also involved in discussions with Bickford about the plaintiff's termination.  Plaintiff's Additional SMF ¶ 59; Deposition of Cheryl Smith ("Smith Dep.") (ECF No. 41-5), attached to Motion, at 23.[22]  Carlton called Bickford about terminating the plaintiff's employment, and Bickford confirmed that the plaintiff had been on *per diem* status for six months.  Plaintiff's Additional SMF ¶ 63; Defendant's Reply SMF ¶ 63.  The plaintiff's employment was then terminated.  *Id*.[23]

On December 6, 2012, Bickford notified the plaintiff that her *per diem* status was being terminated because of her unavailability.  Defendant's SMF ¶ 50; Plaintiff's Opposing SMF ¶ 50.  Bickford alleges that the December 6, 2012, letter was signed by Smith.  Plaintiff's Additional SMF ¶ 64; Defendant's Reply SMF ¶ 64.  The plaintiff received the letter on December 11, 2012.  *Id*. ¶ 65.  It indicated that her employment had been terminated effective December 10, 2012, due to "unavailability to work."  *Id*.

On December 12, 2012, the plaintiff emailed Bickford regarding the letter, stating:

> Good Morning Priscilla, I am sorry for disturbing you while you are on vacation but it is imperative I speak to you.  I received a letter from you dated Dec. 6[th], postmarked the 10th, that I received on the 11th . . . .  The letter was to inform me that I was being removed from payroll the day before due to unavailability.  I have been in touch with Cheryl [Smith] about my return from injury and was to return mid Jan after seeing my PCP.  I feel I have wrongfully been removed from payroll so close to my return when I have been on payroll for this long.  I spoke to

---

[20] The Hospital denies this statement in part, Defendant's Reply SMF ¶ 57; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

[21] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 58, asserting that Carlton also testified that she wanted to terminate the plaintiff because she was a "bad employee[,]" Carlton Dep. at 38-39, 41.

[22] The Hospital denies this statement, Defendant's Reply SMF ¶ 59; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

[23] I omit the plaintiff's statement that, in seeking Bickford's permission to terminate the plaintiff's employment, Carlton did not mention anything about wanting to do so because the plaintiff was a "bad employee," Plaintiff's Additional SMF ¶ 102, which is neither admitted nor supported by the citation given.

> Cheryl, and apparently the letter did not get mailed until the 10th, which if I would have received when intended I could have spoken to you prior to you leaving for vacation.  Please call me as soon as you can to explain to me why by mail I was removed from payroll so [c]lose to my return.
> Cathy LaFlamme, RN

*Id.* ¶ 68.[24]

Following the December 12, 2012, email, the plaintiff talked with Bickford again by phone.  *Id.* ¶ 69.  She stated again that she likely would be cleared for full duty in January 2013, and asked if the termination could be reversed.  *Id.*  Bickford responded that the termination could not be reversed but that, once cleared, the plaintiff could reapply for her position and would be brought back after going through the Hospital's post-offer, pre-employment physical examination to assure that she could perform the duties of her job.  *Id.* ¶ 70.  On or about December 24, 2012, the plaintiff emailed Bickford and Smith again, stating that she would be cleared to work full time with no restrictions as of January 15, 2013, that she was available to work, and wished to interview for the open positions for which she had applied.  *Id.* ¶ 71.

Smith does not recall seeing the December 24, 2012, email and does not recall what, if anything, was done in response to it.  *Id.* ¶ 72.  Bickford does not recall doing anything in response to the December 24, 2012, email.  *Id.* ¶ 73.  Contrary to what Bickford promised, the plaintiff was not permitted to apply for her per diem position in the Med Surg unit.  Plaintiff's Additional SMF ¶ 74; Prescott Aff. ¶ 32.[25]

---

[24] I omit the plaintiff's further assertion that she tried contacting Bickford numerous times, Plaintiff's Additional SMF ¶ 67, which is neither admitted nor supported by the citations given.  I overrule the Hospital's objections to paragraphs 68 through 74, Defendant's Reply SMF ¶¶ 68-74, on the basis that they are irrelevant because the events at issue occurred after the plaintiff's employment was terminated, and she abandoned any claims for conduct postdating her employment termination.  As the plaintiff points out, Plaintiff's Resp. to Req. To Strike ¶¶ 67-74, this evidence either bears directly on her actionable claims or constitutes relevant background evidence, *see, e.g., Ingram v. Brink's, Inc.*, 414 F.3d 222, 229 (1st Cir. 2005) ("To be sure, discriminatory acts or practices that predate or postdate the actionable period can be used as relevant background evidence.").

[25] The Hospital denies this, Defendant's Reply SMF ¶ 74; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

The plaintiff's follow-up doctor's appointment was scheduled for January 15, 2013. Plaintiff's Additional SMF ¶ 53; Defendant's Reply SMF ¶ 53. She was released to return to her position without restrictions on January 15, 2013. *Id.* ¶ 54.

After the plaintiff's termination, Carlton told Bickford that she wanted the plaintiff to stop applying for positions for which Carlton was the manager because the plaintiff was submitting so many applications, and Carlton was not going to hire her. *Id.* ¶ 66.[26] Carlton told Bickford that she did not want the plaintiff "back at the hospital." *Id.* ¶ 60. Part of the reason that Carlton told Bickford that she did not want the plaintiff back at the hospital was the plaintiff's unavailability. *Id.* ¶ 61.

## F. Rationales for Terminating *Per Diem* Employment

When asked what would have been the problem keeping the plaintiff on the *per diem* list until she was cleared to return to work, Carlton answered that if an employee is on the list for six months but unavailable, "we need to replace them." *Id.* ¶ 62. Carlton claimed during her deposition that she made the decision to terminate the plaintiff on December 5, 2012, because the plaintiff was on the *per diem* list and failed to pick up any shifts that were offered to her. *Id.* ¶ 75. Carlton testified that after May 30, 2012, it was her understanding that the plaintiff was no longer on medical leave and that she returned as a *per diem* nurse. *Id.* ¶ 76.[27]

---

[26] The Hospital's objections that paragraphs 60, 61, and 66 are irrelevant because Carlton made the statements at issue after the plaintiff's termination, and the plaintiff has abandoned any claims postdating that event, Defendant's Reply SMF ¶¶ 60-61, 66, are overruled. As the plaintiff points out, Plaintiff's Resp. to Req. To Strike ¶¶ 60-61, 66, this constitutes relevant background evidence, *see, e.g., Ingram*, 414 F.3d at 229. The Hospital further qualifies paragraphs 61 and 66, asserting that Carlton testified that a reason that she did not want to rehire the plaintiff was also her "bad behavior" with co-workers. Defendant's Reply SMF ¶¶ 61, 66; Carlton Dep. at 32-33.

[27] The Hospital qualifies this statement, as well as paragraphs 78 and 80, admitting that Carlton so testified but noting that she also testified contradictorily that she thought the plaintiff was out on medical leave after May 30 and later clarified that she was "confused" about the plaintiff being on medical leave while also being on the *per diem* call list. Defendant's Reply SMF ¶¶ 76, 78, 80; Carlton Dep. at 34-35.

Carlton testified that she would have called the plaintiff to cover shifts after May 30, 2012. *Id.* ¶ 77. She testified that it was her understanding that the plaintiff was able to work following her transfer to *per diem* status on May 30, 2012, but did not pick up any shifts. *Id.* ¶ 78. According to Carlton, "If she was on the list of per diems, then – and she wasn't able to come in, that's why she was probably terminated. Not probably. That's why she was terminated." *Id.* ¶ 79. Later in her deposition, Carlton acknowledged that she was, in fact, aware that the plaintiff was still on medical leave from May 30, 2012, until her termination and was not medically able to work shifts. *Id.* ¶ 80.

Carlton stated during her deposition that she terminated the plaintiff's employment because the plaintiff allegedly was not a good employee and did not get along with her co-workers. *Id.* ¶ 81.[28] When asked why she had not mentioned this second reason when asked earlier during the deposition, Carlton testified that, during a conversation with the Hospital's counsel during a break in the deposition, she remembered that one of her reasons for terminating the plaintiff was that the plaintiff was a bad employee. *Id.* ¶ 82. At the time of the plaintiff's termination, Carlton had never supervised her or personally observed her engage in bad performance. *Id.* ¶ 83. The only feedback that Carlton received from York about the plaintiff related to her attendance. *Id.* ¶ 84. The plaintiff's attendance issues prior to the time she went out on leave were not a factor in her employment termination. *Id.* ¶ 85.

Carlton alleges that the negative feedback about the plaintiff not getting along with co-workers was provided to her by five to 10 staff members during conversations. *Id.* ¶ 86. When asked which staff members allegedly provided her with negative feedback, Carlton testified, "I

---

[28] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 81, asserting that Carlton testified that she terminated the plaintiff because she was unavailable to work and also because she was a bad employee, Carlton Dep. at 38-39, 41.

can't name them.  I don't know who they are.  I don't recall particular people, but the night shift."  *Id.* ¶ 87.  Carlton admitted that, by allegedly terminating the plaintiff's employment because of feedback she had received from others, she was "relying on hearsay."  *Id*. ¶ 88.  She testified that she always "give[s] everybody a chance" to rectify bad behaviors, which is why she did not terminate the plaintiff's employment when she heard the negative rumors about the plaintiff in early 2012. *Id*. ¶ 89.

When asked whether she would terminate any other employee because other staff members complained that they were not getting along with that person, Carlton responded, "that's kind of a crazy question."  *Id*. ¶ 90.  When asked if she would terminate an employee who had one coaching about attendance and whose co-workers complained that they did not get along with that person, Carlton responded, "I am not that mean."  *Id*. ¶ 91.[29]

According to Carlton, if the plaintiff had applied for a job in her department, nothing would have prevented her from putting the plaintiff in the position, assuming that she was qualified for it.  *Id*. ¶ 92.[30]  The December 6, 2012, termination letter made no mention of performance issues and stated that the plaintiff was eligible for reemployment and was encouraged to check the Hospital's web site for job openings.  *Id*. ¶ 100.  The termination form completed by Carlton makes no mention of performance issues, citing as the sole reason for the termination "unavailability."  *Id*. ¶ 101.

---

[29] I omit the paragraphs 93 through 96, setting forth the testimony of Carlton's supervisor, Hospital Director of Nursing Becky Hall, regarding Hall's practices in terminating the employment of nurses about whom there has been negative feedback, Plaintiff's Additional SMF ¶¶ 93-96, sustaining the Hospital's objection that, because Hall became Carlton's supervisor after the plaintiff's employment termination, the testimony is irrelevant, Defendant's Reply SMF ¶¶ 93-94, 96.

[30] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 92, asserting that Carlton's full testimony was that nothing would have prevented her from putting the plaintiff into a position, "if she can do the job," Carlton Dep. at 28.  The Hospital's objection that this statement is irrelevant because it relates to the plaintiff's applications for rehire after her employment was terminated, Defendant's Reply SMF ¶ 92, is overruled.  These statements, made by the key decisionmaker in the plaintiff's termination, constitute relevant background information.  *See*, *e.g.*, *Ingram*, 414 F.3d at 229.

Bickford would not make an employment decision based on hearsay. Plaintiff's Additional SMF ¶ 103; Bickford Dep. at 58-59. Rather, she would want to base an employment decision on her own experience with an employee. *Id.*[31] Bickford said that, prior to terminating an employee, they make sure they do a lot of documentation, and in the plaintiff's case, they did not have any documentation. Plaintiff's Additional SMF ¶ 104; Bickford Dep. at 54.[32]

Following the approval of the plaintiff's FMLA leave, no one from the Hospital ever told her that she needed to provide medical documentation to support her ongoing leave. Plaintiff's Additional SMF ¶ 112; Prescott Aff. ¶ 4.[33] No one from the Hospital ever told her that her employment would be terminated if she did not provide medical documentation supporting her ongoing leave or clearing her return to work. Plaintiff's Additional SMF ¶ 114; Prescott Aff. ¶ 3.[34]

Smith claims that, during the discussion about the plaintiff's employment termination, Bickford told her that the plaintiff was "unable to return to work without a doctor's note." Plaintiff's Additional SMF ¶ 105; Defendant's Reply SMF ¶ 105. Smith testified during her deposition that Bickford told her that the plaintiff's employment was being terminated because she had not provided proper documentation to continue on leave or to return to work. *Id.* ¶ 106. Smith admits that the Hospital never sent the plaintiff a letter indicating that medical

---

[31] The Hospital qualifies paragraph 103, Defendant's Reply SMF ¶ 103, denying that Bickford stated that she always did or that she was required to do so prior to making an employment decision or that Bickford was testifying about the removal of a *per diem* employee after six months of unavailability, Bickford Dep. at 58-59.

[32] The Hospital qualifies paragraph 104, Defendant's Reply SMF ¶ 104, denying that Bickford was testifying about the removal of a *per diem* employee after six months of unavailability, Bickford Dep. at 58-59.

[33] The Hospital denies this, Defendant's Reply SMF ¶ 112; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

[34] The Hospital denies this, Defendant's Reply SMF ¶ 114; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

documentation was required from her. *Id*. ¶ 107.[35]  Smith does not recall whether there was any documentation evidencing her alleged conversation with the plaintiff asking for a doctor's note. Plaintiff's Additional SMF ¶ 108; Smith Dep. at 27.[36]  Smith does not know why, in her email correspondence with the plaintiff, she never asked her for documentation that she alleges was needed by the Hospital. *Id.* ¶ 109.  Smith does not recall ever seeing the January 2012 doctor's note provided by the plaintiff.  Plaintiff's Additional SMF ¶ 110; Smith Dep. at 27.

At the time of the plaintiff's leave, the Hospital had a Long Term Disability ("LTD") insurance policy with The Hartford.  *Id*. ¶ 115.  Smith would assist with the LTD application process by providing a disability packet to the employee and then potentially providing the completed packet to the insurance company.  *Id*. ¶ 116.  Smith understood that updates required by the insurance company to continue the LTD benefits would go directly from the employee to the insurance company.  *Id*. ¶ 117.

The Hospital's LTD policy required that employees provide ongoing proof of disability within 30 days of the insurance company's request in order to continue to receive benefits.  *Id*. ¶ 118.[37]  The Hartford asked the plaintiff for statements from her physician confirming that she was still unable to perform the duties of her Med Surg nurse job in January 2012, March 2012, June 2012, and August 2012.  *Id*. ¶ 119.  In response to those requests, the plaintiff worked with her doctor's office to ensure that it promptly provided The Hartford with the paperwork it needed

---

[35] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 107, noting, as reflected elsewhere in this recitation, that it sent letters in November 2011 and February 2012 regarding a need for a fitness for duty certification prior to returning to work.

[36] The Hospital denies paragraphs 108 and 110 on the basis that they are unsupported by the citations given, Defendant's Reply SMF ¶¶ 108, 110; however, its denial is in the nature of a qualification, which I have incorporated into my recitation.

[37] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 118, asserting that the policy states that employees must provide proof of ongoing disability to the insurer, not the employer, and the Hospital did not communicate with The Hartford about the plaintiff during her leave, The Hartford Certificate of Insurance ("LTD Policy"), Exh. B (ECF No. 45-2) to Plaintiff's Opposing SMF, at 17; Bickford Dep. at 28.

to determine that she was still disabled from performing the duties of her job and eligible for benefits. *Id.* ¶ 120. The plaintiff received LTD benefits until she was cleared to return to work full duty on January 15, 2013. *Id.* ¶ 121.

The plaintiff reported to Smith and Bickford throughout the period that she was out on leave that she was continuing to receive LTD benefits. *Id.* ¶ 122. If someone from the Hospital had told the plaintiff that she needed to provide medical documentation to the Hospital as well as to The Hartford, she would have taken steps to get the Hospital the requested documentation right away, just as she did with The Hartford. *Id.* ¶ 123. In fact, since her doctors were already periodically completing paperwork for The Hartford setting out the extent of her disability, the plaintiff would have provided the Hospital with the same paperwork. *Id.* ¶ 124.[38]

Smith admits that, in about November 2012, she was contacted by the LTD carrier about assisting the plaintiff to return to work part-time. *Id.* ¶ 111.

Smith sent a letter to the plaintiff dated December 24, 2012, indicating that Carlton had advised Smith that the plaintiff had "elected to discontinue her employment" at the Hospital. Plaintiff's Additional SMF ¶ 125; MHRC Charge ¶ 46.[39] The plaintiff did not "elect to discontinue her employment" at the Hospital. Plaintiff's Additional SMF ¶ 126; Defendant's Reply SMF ¶ 126.

Shortly after her employment termination, the plaintiff requested a copy of her personnel file from the Hospital. *Id.* ¶ 127. The file that she received contained the September 26, 2011,

---

[38] The Hospital's objections to paragraphs 123 and 124 on the basis that, given the differences between its documentation requirements and those of the insurer, the plaintiff offers only unsupported speculation regarding what she would have done, Defendant's Reply SMF ¶¶ 123-24, are overruled. The plaintiff is competent to testify as to what she might have done, and the Hospital's objections go to the weight, not the admissibility, of that evidence. The Hospital also denies that the plaintiff was not told that she needed to provide medical documentation, *id.*; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

[39] The Hospital denies this, Defendant's Reply SMF ¶ 125; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

performance evaluation with the "meets" rating in all areas.  *Id*.[40]  In response to the plaintiff's MHRC charge of discrimination, on or about June 6, 2013, the Hospital submitted the second page of the plaintiff's September 26, 2011, evaluation with a new first page attached that the plaintiff had never seen before.  *Id*. ¶ 128.[41]

The Hospital keeps eight to 10 people on the *per diem* list and does not aim to keep a specific number of people on that list.  *Id*. ¶¶ 131-32.  Carlton does not recall posting a *per diem* position following the plaintiff's employment termination, when she filled the *per diem* position, or who filled that position.  *Id*. ¶ 133.  Carlton does not recall if she actually put someone else on the *per diem* list to replace the plaintiff.  *Id*. ¶ 134.  No one was hired as a *per diem* nurse in the Med Surg unit at the time the plaintiff was terminated or within six months afterward.  *Id*. ¶ 135. There is no maximum number of *per diem* employees per department.  *Id*. ¶ 136.  If the current number is not enough, more are added.  *Id*.  Bickford alleges that one of the reasons that the Hospital terminates *per diem* nurses after six months without working is that "their competencies are not up to snuff."  *Id*. ¶ 137.  Bickford does not know whether the plaintiff was up to date with her competencies at the time of the termination and did not check to see if she was.  *Id*. ¶¶ 138-39.

When asked why the Hospital did not keep the plaintiff on *per diem* status until she obtained the doctor's note that she said that she would be able to obtain in January 2013, Bickford testified that managers still need to do performance evaluations for employees even if

---

[40] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 127, denying that the page on which the plaintiff relies is from her September 26, 2011, performance evaluation.  It states that it is instead from her evaluation 90 days after she became a *per diem* employee in June 2011.  *Id*.  However, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

[41] The Hospital denies that this was a new first page, Defendant's Reply SMF ¶ 128; however, I view the evidence in the light most favorable to the plaintiff, as nonmovant.

they are on leave, need to sign off on time cards even if the employee is not working, and need to keep everything in the employee's file current even if he or she is not working.  *Id.* ¶ 140.[42]

### III.  Discussion

"The ADA, broadly speaking, makes it illegal for employers either to discriminate because of a person's disability, or to retaliate against someone because she opposes an act made unlawful by the ADA."  *Collazo-Rosado v. University of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014) (citations omitted).  "Claims of discrimination under the ADA can take one of four forms: intentional discrimination (or "disparate treatment"), disparate impact, hostile work environment, and failure to accommodate."  *Floyd v. Lee*, 968 F. Supp.2d 308, 315 (D.D.C. 2013) (citations and footnote omitted).  "An ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim."  *Freadman v. Metropolitan Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007).

"Courts construe and apply the MHRA along the same contours as the ADA."  *Brown v. Bank of Am., N.A.*, 5 F. Supp.3d 121, 137 (D. Me. 2014) (citation and internal quotation marks omitted).  "Relief available under the Rehabilitation Act is coextensive with relief under the ADA, and the analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds."  *Estate of Crandall v. Godinez*, Case No. 14-cv-1401, 2015 WL 1539017, at *6 (C.D. Ill. Mar. 31, 2015) (citation and internal quotation marks omitted).

---

[42] The Hospital qualifies this statement, Defendant's Reply SMF ¶ 140, asserting that Bickford also testified that the Hospital has a guideline of removing *per diem* nurses because "nurses' competencies deteriorate if they do not work, they fall behind in required education trainings, and it is an administrative burden for managers to maintain training records on such nurses, which are required for licensing and accreditation purposes[,]" Affidavit of Priscilla Bickford ("Bickford Aff.") (ECF No. 41-3), attached to Motion, ¶ 6.

23

The plaintiff continues to press claims pursuant to the ADA, the Rehab Act, and the MHRA for retaliation and for two forms of discrimination, intentional discrimination (disparate treatment) and failure to accommodate. *See* Opposition at 1.

### A.  Disability Discrimination Based on Failure To Accommodate

In order to make out a claim for failure to accommodate in violation of the ADA, an employee must demonstrate that: (1) she is a qualified individual with a disability within the meaning of the ADA; (2) she works (or worked) for an employer covered by the statute; (3) the employer, despite knowledge of her limitations, failed to reasonably accommodate those limitations; and (4) the employer's failure to do so affected the terms, conditions, or privileges of her employment.  *See, e.g., Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir. 1999).  The employee carries the burden of proposing an accommodation that is "at least on the face of things, reasonable."  *Kvorjak v. Maine,* 259 F.3d 48, 55 (1st Cir. 2001).  Once the employee has done so, an employer has the opportunity to defeat liability by showing that an accommodation would impose an undue hardship.  *See, e.g., Carmichael v. Verso Paper, LLC,* 679 F.Supp.2d 109, 129 (D. Me. 2010).[43]

The Hospital seeks summary judgment as to this claim on the basis that, as a matter of law, a request to hold a position open indefinitely is not a reasonable accommodation.  *See* Motion at 7-9 (citing *Watkins v. J & S Oil Co.*, 977 F. Supp. 520, 524-25 (D. Me. 1997), *aff'd,* 164 F.3d 55 (1st Cir. 1998)).  The plaintiff contends that she did not seek an indefinite leave but, rather, informed Hospital personnel in late November 2014 that she likely would be cleared to return to work full time, with no restrictions, in approximately four weeks.  *See* Opposition at 11-

---

[43] The same standard applies in MHRA and Rehab Act cases.  *See, e.g., Calero-Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 11-12 & n.1 (1st Cir. 2004); *Shuper v. Falmouth Mem'l Library*, No. 2:14-cv-506-GZS, 2014 WL 7334163, at *3 (D. Me. Dec. 19, 2014).

15.  She argues that she, therefore, meets her burden of demonstrating that her request for extended leave was facially reasonable, and the Hospital does not demonstrate that a further brief extension would have been an undue hardship.  *See id*. (citing, *inter alia*, *García-Ayala v. Lederle Parenterals, Inc*., 212 F.3d 638, 647 (1st Cir. 2000)).

I agree that there are triable issues of fact as to whether the plaintiff's request was reasonable.  While employers are not required to leave a position open indefinitely, *see Watkins*, 977 F. Supp. at 525, a request for extended leave can be reasonable, depending on the circumstances, *see García-Ayala*, 212 F.3d at 647.  *See also, e.g., Criado v. IBM Corp*., 145 F.3d 437, 443 (1st Cir. 1998) ("A leave of absence and leave extensions are reasonable accommodations in some circumstances."); *Casteel v. Charter Commc'ns,* No. C13-5520 RJB, 2014 WL 5421258, at *5 (W.D. Wash. Oct. 23, 2014), *recon. denied*, 2014 WL 6751219 (W.D. Wash. Dec. 1, 2014) (although plaintiff had missed two prior return-to-work dates, her request, just prior to her employment termination, for a further extension of her leave of absence to February 4, 2010, was evidence that an accommodation existed that would allow her to be able to return to work).  The evidence, viewed in the light most favorable to the plaintiff, aligns more with the circumstances in *García-Ayala* than those in *Watkins*.

In *Watkins*, an employee whose position had been held open for seven weeks after he suffered two heart attacks could not, as of the time his vacant position was filled, provide his employer with an estimate of the duration of his recovery period or an approximate date of his expected return.  *See Watkins*, 977 F. Supp. at 526.  His employer did not fire him on filling his position but, rather, offered alternative positions, which he rejected out of hand.  *See id*.  The employee also failed to provide his employer with a requested medical certification regarding his condition and ability to return to work.  *See id*.  The court observed that, "in failing to provide his

25

employer with any information regarding his ability to return, [the employee] demands what certainly amounts to 'indefinite leave.'" *Id*. It held, "Such an accommodation is not required by the ADA." *Id*. It further observed that the employer had made "an uncontroverted showing that it would suffer undue hardship if it were forced to keep the station manager position vacant." *Id*.

By contrast, in *García-Ayala*, the employee sought a further extension of less than two months, to July 30, 1996, after having been provided 15 months' leave, and the employer made no showing that hardship would have resulted from the proposed accommodation. *See García-Ayala*, 212 F.3d at 642, 647-49. The First Circuit rejected the trial court's finding that the request was one "that [the employee's] job be held open indefinitely[,]" reasoning that, although the employee's doctor could not give absolute assurances that she would be fit to return to work on July 30, and in fact she was not released to return until August 22, the request was sufficiently definite not to be open-ended. *See id*. at 648. The First Circuit also rejected the trial court's finding that a request to provide five months of leave beyond the 12 months provided pursuant to the employer's established policy placed the employer "in an untenable business position[,]" *id*. at 647 (citation and internal quotation marks omitted), observing that there was no evidence that either the July 30 or the August 22 date of release would have imposed "any specific hardship" on the employer, *id*. at 648.

Similarly, in this case, the plaintiff asserts that she informed both Bickford and Smith on November 6, 2012, that her goal was to return to work in 30 to 60 days, and told Smith in late November 2012 that she likely would be cleared to return to work full time, without restrictions, in approximately four weeks. This reasonably could have been understood as a request for a further disability accommodation. *See, e.g., Venable v. T-Mobile USA, Inc.,* Civ. No. 1:07-168-JAW, 2008 WL 4937810, at *10 (D. Me. Nov. 14, 2008) (rec. dec., *aff'd* Mar. 20, 2009) (The

law "does not provide that a request [for accommodation] cannot be conveyed verbally or that an employer cannot be found to have denied a request that is never formally submitted in writing."); *Schmidt v. Safeway Inc*., 864 F. Supp. 991, 997 (D. Or. 1994) (The ADA "does not require the plaintiff to speak any magic words before [she] is subject to its protections. The employee need not mention the ADA or even the term 'accommodation.'").

As in *García-Ayala*, there was no guarantee: as things turned out, the plaintiff was not released to work until slightly later than expected, on January 15, 2013. Yet, crediting the plaintiff's version of events, she provided the Hospital with a sufficiently definite request for a fairly short period of additional leave. The Hospital argues that it had no reason to give credence to her November and December 2012 representations, which were unsupported by any medical report, in view of her history of providing estimated return times that proved illusory, distinguishing this case from the caselaw cited by the plaintiff. *See* Defendant's Reply Memorandum on Motion for Summary Judgment ("Reply") (ECF No. 46) at 6-7. While this is relevant, it is not dispositive for purposes of summary judgment. The First Circuit has observed:

> Some employees, by the nature of their disability, are unable to provide an absolutely assured time for their return to employment, but that does not necessarily make a request for leave to a particular date indefinite. Each case must be scrutinized on its own facts. An unvarying requirement for definiteness again departs from the need for individual factual evaluation.

*García-Ayala*, 212 F.3d at 648 (footnote omitted). In this case, on the facts supplied by the plaintiff, a trier of fact could find that the plaintiff, by the nature of her disability, was unable to provide an absolutely assured time of return but regularly kept the Hospital informed of her status. Further, to the extent that the Hospital argues that the plaintiff, like the employee in *Watkins*, failed to produce requested documentation of her ability to return to work, *see* Motion at 8-9; Reply at 9, the plaintiff introduces evidence that the documentation requests at issue were

made in connection with her FMLA leave from her 24-hour Med Surg job, which was terminated in May 2012, and were never renewed following her placement on the *per diem* list.

Finally, here, as in *García-Ayala*, the Hospital makes no showing that it would have endured a specific hardship in extending the leave.  As in *García-Ayala*, the Hospital's reliance on the application of a facially neutral internal policy/practice (to remove nurses who had not worked in six months from its *per diem* roster) is not, in itself, dispositive in its favor.

"Whether [a] leave request is reasonable turns on the facts of the case."  *Criado*, 145 F.3d at 443.  In this case, disputed material facts prevent the entry of summary judgment in the Hospital's favor.

## B.  Disability Discrimination Based on Disparate Treatment

"To satisfy the requirements of a prima facie case of disparate treatment, a plaintiff must establish that (1) she suffers from a disability or handicap, as defined by the ADA; (2) she was nevertheless able to perform the essential functions of her job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against her because of, in whole or in part, her protected disability."  *Freadman*, 484 F.3d at 99 n.7.

A plaintiff may prove her case "by presenting direct evidence of discrimination" or "indirectly by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)." *Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011) (citation and internal quotation marks omitted).

Direct evidence is a "'a smoking gun' showing that the decision-maker *relied upon* a protected characteristic in taking an employment action."  *PowerComm, LLC v. Holyoke Gas & Elec. Dep't,* 657 F.3d 31, 35 (1st Cir.), *reh'g denied*, 662 F.3d 41 (1st Cir. 2011) (emphasis in

28

original).  In the absence of such evidence, a plaintiff may use the *McDonnell Douglas* burden-shifting approach, pursuant to which:

> If the plaintiff is able to make out the three prima facie elements, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision and to support that reason with credible evidence.  If the defendant is able to provide such a reason, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is simply pretext designed to cover up discrimination against the plaintiff.  Ultimately, the burden of proving unlawful discrimination rests with the plaintiff.

*Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 WL 2638045, at *20 (D. Me. June 12, 2013) (citations omitted).  "The employer's burden of articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times." *Freadman*, 484 F.3d at 99.[44]

The plaintiff cites *Criado* for the proposition that she has direct evidence of discrimination in that the Hospital admits that it terminated her *per diem* status because of her unavailability to cover shifts, which was the only reason articulated in paperwork completed at the time.  *See* Opposition at 16-17.  She argues, in the alternative, that she presents sufficient circumstantial evidence pursuant to the *McDonnell Douglas* rubric to withstand summary judgment as to this claim.  *See id*. at 17-21.

In *Criado*, the First Circuit held that, in circumstances in which an employee's job was terminated for absenteeism after her employer rebuffed a request for additional leave that a jury

---

[44] The Hospital cites *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003), for the proposition that, to successfully allege disparate treatment, a plaintiff must show that others similarly situated to her in all relevant respects were treated differently by her employer.  *See* Motion at 15.  While the First Circuit clarified in *Kosereis* that "[t]he time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality vel non of the employer's articulated reason for having acted adversely to the plaintiff's interests[,]" *Kosereis*, 331 F.3d at 213 (citation and internal quotation marks omitted), I do not read *Kosereis* to hold that such evidence *must* be presented at that stage.  Rather, the First Circuit noted that "[p]laintiffs can show that an employer's stated reasons are pretextual in any number of ways[,]" and that "[o]ne method is to produce evidence that the plaintiff was treated differently than other similarly situated employees."  *Id*. at 214.

could have found was a reasonable accommodation, the jury also could have found that the employer terminated her employment because of her disability.  *See Criado*, 145 F.3d at 444-45.  The First Circuit explained:

> Asserting that the termination was based on [the employee's] absenteeism rather than her disability does not justify [the employer's] action where the absence was the requested accommodation.  Allowing a disabled employee a one-month leave of absence does not absolve an employer's duty to accommodate, especially where the extra leave requested is not expected to be prolonged or perpetual. Considering these facts the jury could have found that [the employer] terminated [the employee] because of her disability.

*Id*.  It quoted *Ralph v. Lucent Techs., Inc.*, 135 F.3d 166 (1st Cir. 1998), in which it had observed:

> The defendant argues that it has already made a reasonable accommodation to the plaintiff's disability by giving him 52 weeks of leave with pay, plus changing his work assignment and supervisor.  The duty to provide reasonable accommodation is a continuing one, however, and not exhausted by one effort.

*Id*. at 145 (quoting *Ralph*, 135 F.3d at 171-72).[45]

Given my conclusion that there is a triable issue as to whether the plaintiff's request for further accommodation was reasonable, *Criado* suggests that there is also a triable issue as to whether her employment termination for absenteeism was based on her disability.  As noted above, the Hospital's bid to distinguish the plaintiff's caselaw, including *Criado*, *see* Reply at 6-7, implicates contested issues of material fact.

---

[45] In similar vein, in *Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir. 2000), cited by the Hospital for the proposition that the duty to make reasonable accommodations does not require that a position be left open indefinitely or that an employer investigate every aspect of an employee's condition before terminating her job for inability to work, *see* Motion at 8 n.3, the court went on to hold: "At the very least, however, an employee who proposes an accommodation while still on short-term leave – as Parker did here, at least two weeks prior to his termination – triggers a responsibility on the employer's part to investigate that request and determine its feasibility[,]" *Parker*, 204 F.3d at 338.  It noted, "An employer who fails to do so, and instead terminates the employee based on exhaustion of leave, has discriminated 'because of' disability within the meaning of the ADA." *Id*.

The Hospital protests that it removed the plaintiff from its on-call list solely pursuant to its longstanding and consistently enforced policy of removing nurses after six months of unavailability and that it had already amply accommodated her disability, having held her part-time Med Surg position open for six months, until May 2012, at which time it could have lawfully fired her, and having thereafter placed her on its Med Surg *per diem* list, from which it could have again lawfully removed her as of August 2012, when she reported that she would not be able to return to work in Med Surg. *See* Reply at 7-8. It reasons that, far from demonstrating intentional discrimination, this uncontroverted evidence indicates that it treated the plaintiff in the same manner as non-disabled employees and more favorably than the law required. *See id.*

The Hospital cites several cases for the proposition that courts routinely decline to find evidence of disparate treatment where, as here, an employee's job is terminated under a regularly followed company policy. *See* Motion at 15 & n.8 (citing *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014); *Thompson v. Baptist Hosp. of Miami, Inc.*, 279 Fed. Appx. 884, 887 (11th Cir. 2008); *Kosereis*, 331 F.3d at 214; *Crano v. Graphic Packaging Corp.*, 65 Fed. Appx. 705, 706-07 (10th Cir. 2003); *Gerety v. Atlantic City Hilton Casino Resort*, 877 A.2d 1233, 1242 (N.J. 2005)).

All of these cases save one, *Kosereis*, are from other jurisdictions and, hence, are not controlling. In any event, all are distinguishable in that none involved an employee's termination for absenteeism in circumstances in which, prior thereto, she had requested an accommodation of additional leave that a trier of fact had, or could have, deemed reasonable. *Compare Hwang*, 753 F.3d at 1162-64 (termination pursuant to six-month leave policy for continued absence not actionable when request for further leave was not reasonable); *Thompson*, 279 Fed. Appx. at 887-88 (plaintiff failed to establish that her termination pursuant to leave policy was a pretext for

racial discrimination; she did not return to work within the 30 days provided by policy and, when she did return, had restrictions that her employer could not accommodate); *Kosereis*, 331 F.3d at 212-14 (plaintiff, who alleged discrimination based on religion and national origin, failed to show that employer's stated reason for discipline, that he failed to come to work on time in contravention of employer's policy, was pretextual); *Crano*, 65 Fed. Appx. at 708 (employer had no duty to reinstate employee after his position had been eliminated while he was on indefinite medical leave; "maintaining an employee on indefinite leave while reserving a job opening for his possible return is not a reasonable obligation to be imposed on employers under the ADA"); *Gerety*, 877 A.2d at 1242 (New Jersey's Law Against Discrimination did not require employer to deviate from even-handed application of its medical leave policy for pregnant employees when it already provided more leave than any relevant federal or state statute required).[46]

I conclude that, pursuant to *Criado*, there is a triable issue as to whether the Hospital discharged the plaintiff based on disability. Accordingly, I recommend that its bid for summary judgment as to this claim be denied.

## C. Retaliation

As a threshold matter, the Hospital seeks summary judgment as to the plaintiff's retaliation claim on the basis that she failed to plead it properly. *See* Motion at 9-10. The plaintiff labeled her claims as ones for "Unlawful Discrimination" and "Failure To

---

[46] *Hwang* and *Gerety* bolster the plaintiff's case in that both rebuffed claims of discrimination against employers who had discharged employees pursuant to evenhandedly applied policies that permitted up to six months' leave. *See Hwang*, 753 F.3d at 1164 (policy granting all employees up to six months' leave was more than sufficient to comply with the ADA in nearly any case, and plaintiff made no allegation that its terms were unequally enforced); *Gerety*, 877 A.2d at 1240, 1242 ("The [New Jersey Law Against Discrimination] does not require an employer to deviate for pregnant employees from the even-handed application of its medical leave policy that already provides more leave than any relevant federal or state statute requires."). However, the First Circuit has declined to take that approach, holding that the reasonableness of requests for extended leave, beyond the time frame provided by even generous employer policies, is to be decided on the facts of those individual cases. *See, e.g., García-Ayala*, 212 F.3d at 647 (declining to adopt *per se* rule that an additional two months, or even five months, of medical leave sought beyond the year provided by employer's policy was an unreasonable accommodation).

Accommodate."  Complaint ¶¶ 82-93.  She explains that she subsumed her claim of retaliation in her claim of unlawful discrimination and that she alleged facts supporting it not only in her MHRC Charge but also in the factual section of her complaint.  *See* Opposition at 22 n.6; *see also, e.g.,* Complaint ¶¶ 72, 76 (Hospital terminated the plaintiff's employment because of, *inter alia*, "her use of protected medical leave"; "The fact that the Hospital lied about the reason for terminating [the plaintiff's job] is evidence that it unlawfully considered her disability and use of protected medical leave as negative factors in its decision-making process.").

The plaintiff's failure to assert a standalone claim of retaliation is problematic.  *See, e.g., Mathis v. City of St. Augustine Beach*, No. 3:13-cv-1015-J-34JRK, 2015 WL 1470762, at *19 n.25 (M.D. Fla. Mar. 31, 2015) (admonishing plaintiff's counsel "for improperly combining two distinct discrimination claims – disparate treatment and retaliation – in  Count III, contrary to the provisions of Rule 8 and 10(b)"); *Petrosyan v. Delfin Grp. U.S.A., LLC*, C.A. No. 2:13-cv-2990-PMD, 2015 WL 685266, at *5 n.2 (D.S.C. Feb. 18, 2015) (noting that disparate treatment, hostile work environment, and retaliation claims "are all distinct claims that should be alleged in separate counts"); *see also* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count[.]").

Nonetheless, summary judgment on this basis in unwarranted.  The function of a complaint is to provide "fair notice" of a claim.  *See, e.g., Graf v. Hospitality Mut. Ins. Co*., 754 F.3d 74, 76 (1st Cir. 2014) (citation and internal quotation marks omitted).  The plaintiff did allege the factual underpinnings of a claim of retaliation, and the Hospital is on notice of the claim.  *See* Motion at 2.  Any error, accordingly, is harmless.  *See Petrosyan*, 2015 WL 685266, at *5 n.2 (plaintiff's failure to assert separate claims for disparate treatment, a hostile work environment, and retaliation was "not in and of itself grounds to dismiss one or all of these

claims at this time[,]" as the plaintiff was "only required to provide adequate notice to the defendant of the basis for the lawsuit and to make a claim plausible").

In the alternative, the Hospital seeks summary judgment as to the retaliation claim on its merits. *See* Motion at 10-14.

To demonstrate retaliation pursuant to the ADA and the MHRA, an employee must show that (i) she engaged in a statutorily protected activity, (ii) she suffered an adverse employment action, and (iii) a causal connection existed between the adverse action and the protected activity. *See, e.g., Kelley v. Correctional Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013); *Bilodeau v. Mega Indus.*, 50 F. Supp.2d 27, 32 (D. Me. 1999). Pursuant to the Rehab Act, a plaintiff must also prove that the protected conduct was the "but-for cause" of the adverse action. *See, e.g., Pollack v. Regional Sch. Unit 75*, 12 F. Supp.3d 173, 190 (D. Me. 2014) (citation and internal quotation marks omitted).

"Where the plaintiff provides no direct evidence of retaliation, [the First Circuit has] relied on the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*[.]" *Pagán-Colón v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, 9 (1st Cir. 2012).

> [U]nder that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of retaliation. If he does so, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected . . . leave.

*Id.* (citation and internal punctuation omitted).

The Hospital seeks summary judgment as to this claim on the bases that the plaintiff (i) did not engage in statutorily protected activity and (ii) does not demonstrate a causal connection between any such activity and her employment termination, including failing to demonstrate that

34

the Hospital's stated reasons were pretextual.  *See* Motion at 11-14.  With respect to the first point, the Hospital argues that the plaintiff's request for indefinite leave was not reasonable and, hence, was not protected activity.  *See id*. at 11.  However, as noted above, there is a triable issue as to whether she made a reasonable request for accommodation.

     With respect to the second point, the Hospital argues that:

1.     The plaintiff fails to make out a *prima facie* case of causation, in that her last request for additional leave was made nearly nine months prior to her employment termination – too long a gap to create an inference of retaliation.  *See id*. at 12-13.

2.     In any event, the plaintiff fails to demonstrate that the Hospital's reasons for terminating her employment were pretextual.  *See id*. at 13-14.  The Hospital simply applied its longstanding policy of terminating *per diem* nurses' employment after six months of unavailability.  *See id*. at 14.  To the extent that it also took into account the plaintiff's performance and attendance issues in deciding to terminate her job, those issues were amply documented long before her disability leave.  *See id*.

     The plaintiff rejoins that she has direct evidence of causation in the form of her termination for "unavailability" by managers who knew that she was unavailable because she required leave as an accommodation for her disability and, in any event, she makes out a circumstantial case sufficient to withstand summary judgment.  *See* Opposition at 22-23.

     The Hospital responds that the plaintiff waives any claim for retaliation by offering only a cursory argument in opposition to its Motion and, in any event, presents no plausible theory as to how her termination in December 2012 could be considered retaliation for her requesting and having been granted multiple leaves of absence between November 2011 and March 2012 and then requesting and having been granted a transfer to the *per diem* list in lieu of termination in

May 2012. *See* Reply at 10; *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The plaintiff's opposition, which occupies approximately two pages and incorporates some earlier discussion by reference, *see* Opposition at 21-23, is not so perfunctory as to be waived, and she makes out a triable claim of retaliation.

First, the plaintiff makes out a *prima facie* case. On her version of events, she requested an accommodation in late November 2012 and was notified of her employment termination by letter dated December 6, 2012. The timing alone suffices to raise an inference of retaliation. *See, e.g., Calero-Cerezo*, 355 F.3d at 25-26 (plaintiff made out *prima facie* case of causation when she was suspended roughly one month after engaging in protected activity).

Second, a jury crediting the plaintiff's version of events and drawing all reasonable inferences in her favor could conclude that the Hospital's official reason for terminating her employment – her unavailability – bolsters a finding that it retaliated against her for seeking additional leave, and that its subsequent reason, that she was a poor employee, is pretextual.

"One way a plaintiff can establish pretext is by showing weaknesses, inconsistencies and contradictions in the employer's proffered legitimate reasons for termination." *Farnham v. Walmart Stores E., L.P.*, No. 1:13-cv-305-JDL, 2014 WL 6908924, at *8 (D. Me. Dec. 8, 2014) (citation and internal quotation marks omitted). While the Hospital points out that the plaintiff had some documented absenteeism issues prior to taking medical leave, Carlton acknowledged that they were not a factor in her termination.

To the extent that the Hospital asserts that the plaintiff had difficulties getting along with co-workers, (i) the plaintiff denies this, (ii) the Hospital articulated that justification only after

the fact, (iii) Carlton initially testified that the plaintiff was terminated for unavailability and then, after a break during which she spoke with the Hospital's counsel, testified that she remembered that the plaintiff also was terminated because she was a bad employee, (iv) Carlton testified that she heard from five to 10 people that the plaintiff had difficulties getting along with co-workers, but could not remember who any of those people were,  (v) Carlton, who had never supervised the plaintiff, indicated that she would not terminate someone's employment based solely on hearsay, and (vi) Bickford also indicated that she would not make an employment decision based on hearsay.

Moreover, the plaintiff introduces evidence that, following her job termination, the Hospital altered her performance evaluation, and Carlton concedes that, following the plaintiff's employment termination, she told Bickford that she did not want the plaintiff back at the Hospital, in part due to her unavailability.

Taking into account the totality of the evidence viewed in the light most favorable to the plaintiff, a trier of fact could find that she was terminated in retaliation for her further request, in November 2012, for medical leave.  The Hospital's bid for summary judgment as to this claim, accordingly, should also be denied.

## IV. Conclusion

For the foregoing reasons, I recommend that the court **_DENY_** the Hospital's motion for summary judgment as to the plaintiff's remaining claims against it.

### _NOTICE_

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14)*

*days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

      *Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 23rd day of May, 2015.

                             <u>/s/  John H. Rich III</u>
                             John H. Rich III
                             United States Magistrate Judge